UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-CV-81534-RUIZ/REINHART

LEONARD B. MITCHELL,

        Plaintiff,

vs.

THE SCHOOL BOARD OF PALM BEACH
COUNTY, FLORIDA,

        Defendant.

_____/

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 43)

This case is presently before me following an order of referral from the Honorable Rodolfo Ruiz II. (ECF No. 58). By his Amended Complaint, Lieutenant Leonard B. Mitchell ("Lt. Mitchell") brings the following claims: discrimination in violation of 42 U.S.C. § 1981 ("§ 1981" or "Section 1981") (Count I); discrimination in violation of the Florida Civil Rights Act, Fla. Stat. § 760 et seq. ("FCRA") (Count II); discrimination in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e et seq. ("Title VII") (Count III); retaliation in violation of § 1981 (Count IV); retaliation in violation of the FCRA (Count V); and retaliation in violation of Title VII (Count VI). ECF No. 8. The School Board of Palm Beach County ("School Board") moves for summary judgment on all counts. ECF No. 43. In addition to the Amended Complaint and the School Board's motion, I have reviewed Lt. Mitchell's response (ECF No. 47), the School Board's reply (ECF No. 53), and the parties' competing Statements of

Material Facts (ECF Nos. 44, 48, and 52). For the reasons that follow I recommend that the School Board's motion be GRANTED.

## I.    LEGAL STANDARDS

A. *Summary Judgment*

Summary judgment is authorized only when the moving party establishes that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970). When evaluating a summary judgment motion, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *See Adickes*, 398 U.S. at 157.

The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must initially "present[] evidence which, if uncontradicted, would entitle it to a directed verdict at trial." *Walker v. Darby,* 911 F.2d 1573, 1576 (11th Cir. 1990) (citation omitted). Then, "Federal Rule of Civil Procedure 56(e) shifts to the non-moving party the burden of presenting specific facts showing that such contradiction is possible." *Id.*

The method by which the moving party can meet its initial burden depends on whether the movant or the non-movant would bear the burden of proof at trial on the underlying legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.

1993). "[F]or issues on which the movant would bear the burden of proof at trial, 'that party must show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991)). In contrast, where, as here, the movant does not bear the burden of proof at trial, it "'is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility.'" *Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2561364, at *1 (S.D. Fla. May 20, 2020) (J. Singhal) (citations omitted). Instead, it merely must point out "an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the non-moving party, who must show that a genuine issue remains for trial." *Four Parcels,* 941 F.2d at 1437–38.

If the moving party meets its initial burden, the non-moving party "may not rest upon the mere allegations or denials in its pleadings." *Walker*, 911 F.2d at 1576. Rather, it must "make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Those Certain Underwriters at Lloyd's Subscribing to Policy No. 25693 JB v. Capri of Palm Beach, Inc.*, 932 F. Supp. 1444, 1446 (S.D. Fla. 1996) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317 (1986)) (J. Moreno), *aff'd sub nom. Certain Underwriters v. Capri*, 128 F.3d 732 (11th Cir. 1997).

An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party." *Miccosukee Tribe of Indians of Florida v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247–48). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. A self-serving and uncorroborated affidavit can create a genuine dispute of material fact (*United States v. Stein,* 881 F.3d 853, 858 (11th Cir. 2018)), but "[c]onclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo,* 903 F.3d 1207, 1213 (11th Cir. 2018). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990).

In sum, the School Board must first offer facts, that when viewed in the light most favorable to Lt. Mitchell, are sufficient to show that the School Board would be entitled to judgment as a matter of law. If the School Board does so successfully, Lt. Mitchell bears the burden of producing additional undisputed evidence showing that

the School Board is not entitled to judgment at this stage or that, contrary to the

School Board's assertion, disputed issues of material fact remain.

Federal Rule of Civil Procedure 56 and Local Rule 56.1 set forth the procedures

for pleading (and responding to) a Motion for Summary Judgment. Rule 56(c) states:

> **(1) Supporting Factual Positions.** A party asserting that a fact . . . is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations . . . admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) Materials Not Cited.** The court need consider only the cited materials, but it may consider other materials in the record.

Fed. R. Civ. P. 56(c). The Court has discretion to disregard a factual assertion or

dispute that is not properly supported by admissible evidence. Fed. R. Civ. P. 56(e);

S.D. Fla. L.R. 56.1(c), (d).[1] A factual assertion that is not properly disputed may be

deemed admitted "provided that: (i) the Court finds that the material fact is

supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ.

P. 56 does not apply." S.D. Fla. L.R. 56.1(c).

---

[1] As the Seventh Circuit aptly pointed out, "Judges are not like pigs, hunting for truffles buried in briefs." *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

B. *Discrimination and Disparate Treatment Claims*

"Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause, or 42 U.S.C. § 1981 must make a sufficient factual showing to permit a reasonable jury to rule in her favor. She can do so in a variety of ways, one of which is by navigating the now-familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Lewis v. Union City, Ga.*, 918 F.3d 1213, 1217 (11th Cir. 2019) ("*Lewis I*"). Another way of proving intentional discrimination is through a "convincing mosaic" of circumstantial evidence. *Lewis II*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*"); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.").

As the *en banc* Eleventh Circuit has explained:

When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges

> with the [plaintiff's] ultimate burden of persuading the [factfinder] that
> she has been the victim of intentional discrimination."

*Id.* at 1220–21 (citations omitted). Where a plaintiff attempts to satisfy his burden through comparator evidence, he must show that he and the comparators are "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1226.

Notably, in presenting a nondiscriminatory reason for any alleged adverse employment action, the defendant has only a burden of production and "does not bear a formal burden of persuasion." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In other words, "the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Id.* at 260. As the Supreme Court has stated:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated for the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Id.* at 254–56 (internal citations omitted).

As for the plaintiff's subsequent burden to show the nondiscriminatory reason is a pretext, the plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089, 67 L. Ed. 207 (citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S. Ct. at 1825–26). *See also Lewis II*, 934 F. 3d at 1186 ("A plaintiff can show pretext by: (i) casting sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct, (ii) showing that the employer's articulated reason is false and that the false reason hid discrimination, or (iii) establishing that the employer has failed to clearly articulate and follow its formal policies.").

A plaintiff's failure to produce a comparator does not necessarily doom his case. *Id.* On the contrary, a plaintiff will always survive summary judgment if he presents a "convincing mosaic" of circumstantial evidence that creates a triable issue as to the employer's discriminatory intent. *Id.* "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis II*, 934 F.3d at 1185 (citations omitted).

To discern a discriminatory intent, courts focus on the person making the employment decision. "'Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.' When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (citations omitted).

This same analysis applies to claims under the FCRA. *See Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1195 n.1 (11th Cir. 2004) ("The [FCRA] was patterned after Title VII, and Florida courts have construed the act in accordance with decisions of federal courts interpreting Title VII.").

"[Section] 1981's pleading standard for discrimination claims is at least as, if not more, restrictive than Title VII." *Henderson v. City of Birmingham, Alabama*, 826 Fed. App'x 736, 740 n.2 (11th Cir. 2020) (citing *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1051 n.2 (11th Cir. 2020) and *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. ----, 140 S. Ct. 1009, 1017–19, 206 L. Ed. 2d 356 (2020)) (internal citations omitted)). The elements of Lt. Mitchell's claim for disparate treatment under § 1981 in Count I are the same as the elements of his Title VII claim. *Harrison v. Belk, Inc.*, 748 Fed. App'x 936, 941 (11th Cir. 2018) (citation omitted). Here, too, Lt. Mitchell can meet this burden by showing "either a similarly situated comparator who was not treated similarly under similar circumstances, or a 'convincing mosaic' of circumstantial evidence suggesting he was terminated for discriminatory reasons." *See Perry v. Schumacher Grp. of Louisiana*, No: 2:13-cv-36-

FtM-29DNF, 2020 WL 3971937, at *7 (quoting *Biggers v. Koch Foods of Alabama, LLC*, 2020 WL 2312033, at *5 (M.D. Ala. May 8, 2020)). However, for his §1981 claim, Lt. Mitchell bears the burden of showing that race was a *but-for* cause of the discrimination, not merely a motivating factor. *Comcast*, 140 S. Ct. at 1014.

C. *Retaliation Claims*

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The FCRA contains a similar provision and is analyzed under the same framework. Fla. Stat. § 760.10 *et seq.* (2020); *see Wilbur*, 393 F.3d at 1195 n.1. Moreover, the elements of a retaliation claim under Title VII and § 1981 are also the same. *Henderson*, 826 Fed. App'x at 740 n.2 (citing *Martin*, 959 F.3d at 1051 n.2).

The Eleventh Circuit *en banc* recently summarized the framework for assessing Title VII retaliation claims:

> To make a prima facie case for a claim of retaliation under Title VII, a plaintiff must first show (1) that "she engaged in statutorily protected activity," (2) that "she suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).
>
> Once the prima facie case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." *Bryant,* 575 F.3d at 1308. The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. *Id.* If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask

[retaliatory] actions." *Id.* To establish the necessary causation, a plaintiff must demonstrate that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). In other words, "a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired." *Jefferson*, 891 F.3d at 924. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.,* 704 F.3d 1327, 1333 (11th Cir. 2013).

*Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134–35 (11th Cir. 2020) (en banc). For purposes of establishing a *prima facie* case, "the proper standard in a retaliation case is the one set out by the Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), and confirmed by this circuit in *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)— the retaliation is material if it 'well might have dissuade[d] a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 857 (11th Cir. 2020). The standard is an objective one based on "reactions of a *reasonable* employee," but it also considers context. *Burlington*, 548 U.S. at 68–69, 126 S. Ct. 2405, 165 L. Ed. 2d 345.

To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (internal quotation marks and citation omitted). The relatedness between the protected activity and adverse action may be demonstrated by temporal proximity. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).

Once the plaintiff establishes a prima facie case of retaliation, the defendant's burden of proffering a legitimate non-discriminatory reason "is a low bar to hurdle. The burden placed on the employer is only an evidentiary one; a burden of production that 'can involve no credibility assessment.'" *Flowers v. Troup Cty., Georgia, Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

The plaintiff has a more rigorous burden for demonstrating that the proffered reason is pretextual:

> Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "[A] reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). And to repeat, in determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her.

*Gogel*, 967 F.3d at 1136 (brackets in original). "While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Id.* at 1138 n.15. An intervening event can "undermine[] the significance of any temporal proximity." *Id.* "[M]ere temporal proximity without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th

Cir. 2007), cited in *Grant v. Miami-Dade Cty.*, 13-22008-CIV, 2014 WL 7928394, at
*8 (S.D. Fla. Dec. 11, 2014), *aff'd sub nom. Grant v. Miami-Dade Cty. Water & Sewer
Dep't*, 636 Fed. App'x 462 (11th Cir. 2015).

As with disparate treatment claims, there is another way to make a prima facie
showing of retaliation. Here, again, Lt. Mitchell can choose to rely on "'a convincing
mosaic of circumstantial evidence' that would permit a jury to infer that the
[defendant] retaliated against him." *Calvert v. Doe*, 648 Fed. App'x 925, 929 (11th Cir.
2016).

## II.    UNDISPUTED FACTS

### The Hiring Process for Police Chief

1.     Plaintiff Lieutenant Leonard Mitchell ("Lt. Mitchell") is an African
American man who worked for Defendant Palm Beach County School Board's
("School Board") Police Department from 1983 to 2007, retiring with the rank of
Commander/Major. Defendant School Board's Statement of Facts ("DSOF") ¶¶ 1–
2 (ECF No. 44); Plaintiff Lt. Mitchell's Statement of Facts ("PSOF") ¶ 123 (ECF
No. 48). Lt. Mitchell held the rank of Major for nine years during his original 24-
year tenure with the School Board. PSOF ¶ 147 (ECF No. 48). Lt. Mitchell
returned to work for the School Board in 2018 (DSOF ¶ 52) and in June 2020, he
was promoted to his current rank of Lieutenant. DSOF ¶ 122. In the time between
his periods of employment with the School Board, Lt. Mitchell worked for the
Riviera Beach Police Department, reaching the rank of Acting Assistant Chief.
DSOF ¶¶ 18, 115; ECF No. 45-1 at 218.

2.     On May 15, 2018, the School Board entered into a contract with the Florida

Police Chiefs Association ("FPCA") to facilitate the hiring process of the School Board's Police Chief. DSOF ¶ 3. The FPCA's role included narrowing the field of applicants to a group that would receive written questionnaires, reviewing their responses, and recommending who should be interviewed based on the FPCA's expertise in this area. DSOF ¶¶ 7, 21.[2]

3.      The School Board was not contractually obligated to accept the FPCA's recommendations. PSOF ¶ 129.

4.      Lt. Mitchell applied for the Police Chief position. DSOF ¶ 5. At that time, Lt. Mitchell knew the FPCA was "conducting the process." *Id*.

5.      The FPCA recommended that the following six candidates receive written questionnaires: Lt. Mitchell, Frank Kitzerow, Lawrence Leon, Jason Overbay, Kelli Smith, and Vanessa Snow. DSOF ¶ 10.

6.      When the FPCA gave its recommendations, it had no knowledge of the race of the candidates. DSOF ¶ 10. Lt. Mitchell was the only African American candidate to receive a written questionnaire. *Id*.

7.      The FPCA sent an email to Lt. Mitchell that read, in relevant part, as follows:

> The Florida Police Chiefs Association (FPCA) STARS Executive Search Program, in conjunction with the School District of Palm Beach County, is pleased to notify you that you have been selected to advance in the screening process for the position of Chief of School Police and District Security.

---

[2] Lt. Mitchell attempts to dispute this fact but does not cite to any evidence in the record showing that the School Board actually hired the FPCA for some other reason.

> Attached please find a questionnaire that requires your response by Wednesday, June 6, 2018.
>
> \*                              \*                              \*
>
> Additionally, the School District of Palm Beach County has scheduled the interview portion of this search for Thursday, June 14, 2018. Please reserve this date in the event that you are selected to move forward in this process….

DSOF ¶ 9.

8.      The FPCA recommended three people to be interviewed: Frank Kitzerow, Jason Overbay, and Vanessa Snow. DSOF ¶ 14. The FPCA stated that if it were to recommend a fourth interviewee, it would have recommended Kelli Smith. *Id.*

9.      Frank Kitzerow had previously been the Chief of Police for the Town of Jupiter, Florida and for the City of Portsmouth, Virginia. DSOF ¶ 15.

10.     Jason Overbay was a Major who previously served as a Field Training Officer/Police Officer for the School Board and had been the Field Operations Manager and Safe Schools Training Manager for the Metro Nashville School District. DSOF ¶ 16.

11.     Vanessa Snow was an Assistant Chief for the Boynton Beach Police Department. DSOF ¶ 17. She had also been a Counterterrorism Intelligence Analyst for the Federal Bureau of Investigation, a practicing attorney, and a Police Commander for the School Board. *Id.*

12.     On June 8, 2018, the FPCA made its recommendations to the following School Board employees: Chief Operating Officer Wanda Paul ("Ms. Paul") (who was the hiring manager for the Police Chief position), Chief of Staff Amity Schuyler ("Ms. Schuyler"), Chief of Human Resources Gonzalo La Cava ("Dr. La

Cava"), and Mark Mitchell,[3] the School Board's Director of Compensation and Employee Information Services (who was also appointed to serve as the "facilitator" for the Police Chief hiring process). DSOF ¶¶ 4, 19.[4]

13.    The criteria the FPCA used in recommending the three candidates to be interviewed included: leadership or management experience; experience with crisis management and leading "from the front"; collaborative philosophy; technology experience; campus experience; and track record with other agencies. DSOF ¶ 20.

14.    The four School Board employees who received the FPCA's recommendations in the June 8th call were not informed of and did not ask about the races of the candidates, however, the School Board "knew or at least could have known that [Lt. Mitchell] was African American or dark-skinned" based on Lt. Mitchell's previous employment with the School Board. DSOF ¶¶ 24, 25.

15.    The School Board employees who received the FPCA's recommendation of the three candidates to interview accepted this recommendation, and as a professional courtesy, added the incumbent Police Chief, Lawrence Leon, to the

---

[3] Mark Mitchell and Lt. Mitchell share a last name. For clarity, the Court will refer to Mark Mitchell by his full name and to Plaintiff Lt. Leonard Mitchell as "Lt. Mitchell".

[4] Lt. Mitchell attempts to dispute this fact, arguing that "[i]t was only Mark Mitchell's recollection as to who participated in the call" during which the FPCA made its recommendations to School Board employees. PSOF ¶ 19. Nonetheless, Lt. Mitchell does not present any contradictory facts, and thus has not met the burden for creating a disputed issue of fact. *See Walker*, 911 F.2d at 1576 ("Federal Rule of Civil Procedure 56(e) shifts to the non-moving party the burden of presenting specific facts showing…contradiction [of the moving party's evidence] is possible.").

list. DSOF ¶¶ 27, 28.

16.     Lt. Mitchell was qualified for the position of Police Chief in that he met the basic qualifications for the position and proceeded past the initial screening phase of the hiring process. DSOF ¶ 29.

17.     On June 11, 2018, Mark Mitchell called Lt. Mitchell and told him that the School Board had selected the candidates to be interviewed for the position of Police Chief, and that he was not one of them. DSOF ¶ 31.

18.     During the call with Lt. Mitchell, Mark Mitchell "wouldn't answer any questions concerning the process, period." DSOF ¶ 32.

19.     On June 14, 2018, the School Board's interview committee spoke to the candidates for the Police Chief position. DSOF ¶ 35. Seven people were on the interview committee: School Board employees Darren Edgecomb, Mark Mitchell, Ms. Paul, and Dr. La Cava, as well as non-School Board employees Circuit Court Judge James Martz, Ian Moffett, and Gerald Monahan. DSOF ¶ 37.

20.     On June 16, 2018, Lt. Mitchell emailed a general School Board email address regarding his "displeasure with the chief selection process." DSOF ¶ 48.

21.     On June 20, 2018, the School Board's decision to hire Frank Kitzerow ("Chief Kitzerow") as Police Chief was announced. DSOF ¶ 49; ECF No. 8 ¶ 16.

22.     Lt. Mitchell attended the June 20, 2018, School Board meeting (at which Chief Kitzerow's hiring was announced) and questioned Ms. Paul as to why he had not been interviewed for the Police Chief position. Ms. Paul told Lt. Mitchell that the School Board had worked with a consultant in the hiring process and relied

on its recommendations. DSOF ¶ 50; PSOF ¶ 132.[5]

23.     In August and September of 2018, Lt. Mitchell's attorney contacted the School Board's public records department to obtain records regarding Lt. Mitchell's employment with the School Board. PSOF ¶ 134. Lt. Mitchell's attorney also requested the minutes from the June 20, 2018, School Board meeting, as well as an April 2018 review of the School Board's Police Department prepared by the Council of Great City Schools. *Id.*

**Lt. Mitchell Returns to Work for the School Board and Applies for a Promotion to Assistant Director**

24.     After applying for multiple positions within the School Board's organization, Lt. Mitchell was eventually hired as a Police Officer in September 2018. DSOF ¶ 52; PSOF ¶ 135. The first school where Lt. Mitchell worked was Boynton Beach High School ("BBHS"). DSOF ¶ 72.

25.     On September 28, 2018, Lt. Mitchell applied to be an Assistant Director. DSOF ¶ 53.

26.     Since the Assistant Directors reported directly to Chief Kitzerow, he was "hands-on" in selecting the candidates for the position. DSOF ¶¶ 54, 55.

27.     Chief Kitzerow thought it was important for the School Board's Police Department to have a racially diverse chain of command and was working on achieving this goal. PSOF ¶ 137.

---

[5] Lt. Mitchell attempts to dispute this fact, stating that "the truth of the matter is that while [the School Board] did work with the vendor, in the end, the final decision" belonged to the School Board. Regardless of the truth or falsity of this statement, it does not create a dispute as to what Ms. Paul *told* Lt. Mitchell at the meeting.

28.     Nine candidates were interviewed for the two Assistant Director positions.
DSOF ¶ 57. Seven of the candidates were white; Lt. Mitchell and one other
candidate, former West Palm Beach Police Chief Regina Price, were African
American. *Id*.

29.     Chief Kitzerow selected Price ("Assistant Director Price") and Dennis
Weiner ("Assistant Director Weiner"), who is white, based on their experience as
Police Chiefs. DSOF ¶ 61. Assistant Directors Price and Weiner also had local
experience, and Assistant Director Weiner was an attorney. DSOF ¶ 61.

30.     While Chief Kitzerow had not originally expected former Police Chiefs to
apply for the Assistant Director positions, Police Chief experience became a
significant factor during the hiring process. DSOF ¶ 60.

**Lt. Mitchell's Transfer to Another School**

31.     On December 4, 2018, Lt. Mitchell's supervisor, Sergeant David Furtado
("Sgt. Furtado"), emailed Captain Ezra Dilbert ("Capt. Dilbert") to recommend
several transfers within his zone, including the transfer of Lt. Mitchell from
Boynton Beach High School (BBHS) to Lake Worth Middle School ("LWMS").
DSOF ¶¶ 75, 77.

32.     On December 5, 2018, Capt. Dilbert responded to Sgt. Furtado's email,
saying, "Sounds good to me." DSOF ¶ 78.

33.     Police Officers do not like being involuntarily transferred from their schools
due to a transfer's tendency to disrupt relationships with coworkers, supervisors,
and students. PSOF ¶ 142. During Lt. Mitchell's previous tenure with the School

Board (which ended 11 years earlier), it was "protocol" to discuss any transfer with the officer and the principals of both schools. *Id.*

34.   Sgt. Furtado told Lt. Mitchell about his upcoming transfer during the week of December 17, 2018. DSOF ¶ 86; PSOF ¶ 141. Lt. Mitchell also received a letter from Sgt. Furtado on December 20, 2018 informing Lt. Mitchell about the transfer. DSOF ¶ 87. Lt. Mitchell reported to work at LWMS on January 8 or 9, 2019. *Id.*

35.   Lt. Mitchell objected to the fact that his transfer was involuntary and that no one discussed the transfer with him or the principals of BBHS and LWMS before the transfer occurred. DSOF ¶ 89.[6]

36.   Capt. Dilbert did not discuss the transfer with Lt. Mitchell because "some things are not up for discussion" and the "[n]eeds of the agency comes [sic] first." DSOF ¶ 91.

**The First EEOC Charge**

37.   On December 18, 2018, Lt. Mitchell filed an EEOC Charge of Discrimination ("First EEOC Charge") alleging racial discrimination occurring in June 2018. DSOF ¶ 63. Lt. Mitchell alleged that he was the target of racial discrimination during the hiring process for the Police Chief position. DSOF ¶ 64.[7]

---

[6] On December 21, 2018, the principal of LWMS emailed Capt. Dilbert to express his objection to the transfer. PSOF ¶ 145; ECF No. 49-12.

[7] The School Board uses the phrase "with regard to the hiring for the Police Chief position." DSOF ¶ 64. Lt. Mitchell disputes this fact, stating, "[Lt. Mitchell] complained he was discriminated against in that he was not offered an interview. [Lt. Mitchell] does not dispute Chief Kitzerow was the better candidate." PSOF ¶ 64. The Court concludes that while the parties are using different language, they agree that

38.     Lt. Mitchell's First EEOC Charge did not mention his unsuccessful application to be promoted to Assistant Director. DSOF ¶ 65.

39.     Deneen Wellings ("Ms. Wellings"), the School Board's EEO Coordinator, was responsible for handling external complaints of harassment and discrimination, including employee complaints made to the EEOC and Florida Commission on Human Relations ("FCHR"). DSOF ¶ 67.

40.     After receiving notice of Lt. Mitchell's First EEOC Charge, Ms. Wellings requested the relevant hiring file from Human Resources. DSOF ¶ 69. Ms. Wellings did not investigate the races of the candidates who were in the running for the Police Chief position with Lt. Mitchell. PSOF ¶ 140.

41.     The plan to transfer Lt. Mitchell from BBHS to LWMS was already underway when he filed the First EEOC Charge, however, Lt. Mitchell was unaware of the plan at that time. DSOF ¶¶ 84, 86.

**The Hiring Process for Police Major**

42.     Lt. Mitchell applied for a Police Major position on March 4, 2019. DSOF ¶ 93. This position reports directly to the Assistant Directors. DSOF ¶ 94.

43.     Seven people were interviewed for the Major position, five of whom were white, in addition to Lt. Mitchell and another African American candidate. DSOF ¶ 95. All interviews took place on April 22, 2019. DSOF ¶ 96.

44.     The interview panel was made up of the following six people: Jesus Armas,

---

Lt. Mitchell's complaint was that racial discrimination occurred during the hiring *process* for the Police Chief position.

Assistant Director Pat McCutcheon, Assistant Director Weiner, Dr. George Lockhart, Assistant Director Price, and Gail Williams of Human Resources (who served as the facilitator). DSOF ¶ 97.[8] Chief Kitzerow observed the interviews but was not a part of the interview committee. *Id.*

45.    Only three members of the interview panel, as chosen by Gail Williams, contributed to the applicants' scores: Jesus Armas, Dr. George Lockhart, and Assistant Director Price. DSOF ¶ 98. The four highest scores in the interview process were achieved by three white applicants (Matthew Baxter, Anthony Makowski, and Melvin Mosier) and one African American applicant (Terry Moore). DSOF ¶ 100. Lt. Mitchell scored sixth out of the seven interviewees. DSOF ¶ 101.

46.    The applicants' scores were only one component of the evaluation process. In selecting a Major, Chief Kitzerow considered the criteria listed in the job description and the recommendation of the interview panel, as well as each candidate's level of experience and performance during the interview. DSOF ¶¶ 102–03. Specifically, Chief Kitzerow was looking for candidates who were experienced, were familiar with the School Board's current processes, and could advance the organization quickly and efficiently. DSOF ¶ 104.

47.    When the interviews for the Major position occurred, Chief Kitzerow was

---

[8] Chief Kitzerow submitted the names of the three Assistant Directors to be panelists, while Human Resources assembled the rest of the panel. DSOF ¶ 99.

not aware of Lt. Mitchell's First EEOC Charge. DSOF ¶ 117.[9] Ms. Wellings did not inform Chief Kizterow about Lt. Mitchell's First EEOC Charge, at least not before the April 22, 2019 interviews for the Major position. DSOF ¶ 70.

48.      Matthew Baxter, Anthony Makowski, Terry Moore, and Melvin Mosier, the four applicants with the highest scores, were offered positions as Majors. DSOF ¶ 105. These candidates were all current employees of the School Board (and had been employed by the School Board for significant periods of time). They also had strong organizational knowledge and were qualified to perform the duties of the position. DSOF ¶ 106. PSOF ¶ 149.

49.      At the time of the hiring process for the Major position, Matthew Baxter was an Administrative Sergeant and stated in his application that he had been a supervisor in the School Board's Police Department for 16 years and had experience with supervising officers, fostering relationships with outside agencies, managing records, helping build the budget, and developing the organization chart. DSOF ¶ 108.

50.      Anthony Makowski was a Captain and had planned many significant events, including graduations; he was also heavily involved in recruiting and retention. DSOF ¶ 109. He provided insight into current conditions within the School Board's organization and could immediately begin addressing outside

---

[9] Lt. Mitchell attempts to refute this fact by citing the other actions he claims were protected activities. PSOF ¶¶ 85, 90, 117. The facts Lt. Mitchell proffers do not create a genuine issue of fact as to whether Chief Kizerow knew about Lt. Mitchell's First EEOC Charge at the time of the Police Major interviews.

pressures the Department was facing, including the need to put a police officer in every school. *Id.*

51.     Terry Moore had been a Captain for five years and a Sergeant for seven years. DSOF ¶ 110.

52.     Prior to the start of the hiring process, there were three vacancies for Majors; after the interviews occurred and before candidates were informed of the selections, a fourth vacancy arose and was filled from the same pool of candidates. DSOF ¶ 111. Melvin Mosier was selected to fill the fourth vacancy, based on both his performance and his status as an attorney, since the School Board's Police Department was facing many legal issues at the time. DSOF ¶¶ 112–13.

53.     Chief Kitzerow acknowledged that Lt. Mitchell had been a Major previously and had a lot of experience with the School Board, but also that many years had passed since then. DSOF ¶ 114. Due to the rapid growth of the School Board's Police Department and the resulting demands that would be placed on new employees, Chief Kitzerow valued familiarity with current processes for hiring; training; budget and budget proposal; ordering vehicles; and purchasing uniforms and equipment. *Id.* Chief Kitzerow also acknowledged Lt. Mitchell's experience as Acting Assistant Chief at the City of Riviera Beach Police Department, but Chief Kitzerow believed working for the School Board was quite different from working in a municipal department. DSOF ¶ 115.

54.     When Chief Kitzerow started as Chief, there was only one African American person on the command staff; by August 11, 2020, 28% of the Command Staff were

African American. DSOF ¶ 121.

**Lt. Mitchell's Second EEOC Charge**

55.    Lt. Mitchell filed a second Charge of Discrimination ("Second EEOC Charge"), on July 8, 2019. DSOF ¶ 118. In the Second EEOC Charge, Lt. Mitchell alleged that the School Board discriminated against him on the bases of race and national origin. DSOF ¶ 119. Lt. Mitchell also alleged that he was retaliated against when he was denied a promotion to Police Major and transferred from BBHS to LWMS. *Id.* Lt. Mitchell wrote, "I was retaliated against because I filed a charge of discrimination against my employer on December 18, 2018 charge number 510-2019-01430." *Id.* Lt. Mitchell's Second EEOC Charge did not mention the Assistant Director position. *Id.*

56.    With regard to his transfer from BBHS to LWMS, Lt. Mitchell stated in his EEOC charge that his new location was farther away from his home and that he was the only officer assigned there. ECF No. 8, Exhibit A. Lt. Mitchell stated that he preferred working at BBHS because it was "closer and more convenient" to his home, and because it was a "two-person job where the assignments were shared." *Id.*

## III.    DISCUSSION

Lt. Mitchell asserts six claims against the School Board in the Amended Complaint. ECF No. 8. Count I alleges discrimination in violation of § 1981. ECF No. 8 at 7. Count II alleges discrimination in violation of the FCRA. *Id.* at 9. Count III alleges discrimination in violation of Title VII. *Id.* at 12. Count IV alleges retaliation in violation of § 1981. *Id.* at 14. Count V alleges retaliation in violation of

the FCRA. *Id.* at 15. Finally, Count VI alleges retaliation in violation of Title VII. *Id.* at 17.

A. *Discrimination Claims (Counts I, II, and III)*

As an initial matter, the School Board argues that it is entitled to summary judgment on Count I, discrimination in violation of § 1981, because Lt. Mitchell erred in failing to bring his claims through 42 U.S.C. § 1983 ("§ 1983"). In a case concerning a claim for damages against a school district, the Supreme Court held "that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by Section 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). *See also Butts v. Cty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000) ("[I]n *Jett*, the Supreme Court refused to find in § 1981 an implied cause of action against state actors because Congress had clearly established § 1983 as the remedial scheme against state actors.").

Nevertheless, the "failure to plead the correct legal theory is not necessarily fatal to a plaintiff's claim when the defendant has sufficient and fair notice of the correct legal theory." *King v. Butts Cty. Georgia*, 576 F. App'x 923, 931 (11th Cir. 2014). In *King*, the Eleventh Circuit reversed the dismissal of the plaintiff's § 1981 claim, finding that despite the plaintiff's failure to explicitly invoke 42 U.S.C. § 1983, the allegations in his complaint were sufficient to give the defendants notice of the claim. *King*, 576 F. App'x at 931.

The School Board attempts to distinguish *King* based on Lt. Mitchell's failure to allege that the School Board's actions were "'under color of state and local law' or that [its] conduct affected his 'federally protected rights.'" ECF No. 53 at 2. I reject this argument. In the Amended Complaint, Lt. Mitchell alleged that the School Board, a government entity, "permitted a pattern and practice of unlawful discrimination by allowing Lt. Mitchell to continue to be subjected to disparate treatment and discrimination . . ." ECF No. 8 ¶¶ 56, 108. I find this allegation sufficient to have put the School Board on notice that Lt. Mitchell was complaining of actions that violated his federal rights and that they were committed under the color of state law.

In a footnote, the School Board argues in the alternative that it is "entitled to summary judgment on the merits of Plaintiff's Section 1981 claims" based on the overlap between the legal standards for Section 1981 claims and Title VII claims. ECF No. 43 at 5 n.2. Typically, courts decline to address substantive arguments summarily raised in a footnote, because "a legal argument only in a footnote is an incorrect place for substantive arguments on the merits." *Golden v. Univ. of Miami*, No. 1:18-cv-24414, 2020 WL 6482197, at *1 n.1 (S.D. Fla. Sept. 1, 2020) (J. Gayles) (internal quotation marks omitted) (quoting *Espinoza v. Galardi S. Enters., Inc.*, No. 14-CIV-21244, 2018 WL 1729757, at *4 (S.D. Fla. Apr. 10, 2018) (J. Goodman)). Here, however, the parties have adequately briefed the relevant issues by way of addressing Lt. Mitchell's Title VII and FCRA claims, so I will address the § 1981 claims on their merits.

As bases for his claims of discrimination and disparate treatment, Lt. Mitchell asserts that the following actions constitute "adverse employment treatment" making up a "pattern and practice of unlawful discrimination": "[i]n June 2018, the District's failure to interview him"; "[t]he District's decision not to consider him for the position of Chief"; "[Lt. Mitchell's] relocation"; and "denial of positions for which he was well qualified." ECF No. 8 at 7–8, 10, 12.[10] Accordingly, the alleged discrete acts of discrimination are as follows: (1) the School Board's failure to interview Lt. Mitchell for the position of Chief; (2) the School Board's failure to promote Lt. Mitchell to either of the positions of Assistant Director or Major; and (3) Lt. Mitchell's relocation from BBHS to LWMS.

### 1. Failure to Interview/Consider Lt. Mitchell for Police Chief Position

Two asserted bases for Lt. Mitchell's claims of disparate treatment are "[i]n June 2018, the [School Board's] failure to interview him" and "[t]he [School Board's]

---

[10] The Amended Complaint also includes "Mr. Mark Mitchell's misrepresentations" as an instance of "adverse employment treatment" suffered by Lt. Mitchell. ECF No. 8 at 8, 10, 12. Specifically, the Amended Complaint alleges that when Lt. Mitchell questioned Mark Mitchell as to why Lt. Mitchell was not selected to be interviewed for the Chief position, "Mark Mitchell denied any knowledge." ECF No. 8 at ¶ 12. The Amended Complaint alleged "Mark Mitchell's claim that he was not involved was false as public records identify [Mark] Mitchell as being involved in the hiring process." *Id.* at ¶ 15.

Mark Mitchell's alleged dishonesty toward Lt. Mitchell does not rise to the level of an adverse employment action, which "must 'impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way.'" *Minnifield v. City of Birmingham Dep't of Police*, 791 Fed. App'x 86, 90 (11th Cir. 2019) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), overruled on other grounds by [*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)]).

decision not to consider him for the position of Chief." ECF No. 8 ¶¶ 70, 87. The School Board does not dispute that Lt. Mitchell has established a prima facie case of disparate treatment based on the School Board's actions related to the hiring of the Police Chief. ECF No. 43 at 7. Rather, the School Board argues under the *McDonnell Douglas* framework that it "had legitimate, non-discriminatory reasons for not interviewing, and thereby not hiring, Lt. Mitchell," namely, that "[t]he outside agency the [School] Board retained to recommend candidates to be interviewed did not recommend that the [School] Board interview Lt. Mitchell, and Lt. Mitchell was not already the incumbent in the position." *Id.* at 7–8.

The Court finds this explanation meets the School Board's burden of production. As noted above, the "defendant need not persuade the court that it was actually motivated by the proffered reasons;" the explanation need only be legally sufficient to justify a judgment for the defendant, and "frame[d] . . . with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 254–6, 101 S. Ct. 1089, 67 L. Ed. 2d 207.

At this stage in the *McDonnell Douglas* framework, the burden shifts back to Lt. Mitchell to "demonstrate that the proffered reason was not the true reason for the employment decision," i.e., that the proffered reason was a pretext. *Burdine*, 450 U.S. at 256, 101 S. Ct. 1089, 67 L. Ed. 207; *Lewis I*, 918 F.3d at 1220–21 (citing *McDonnell Douglas*, 411 U.S. at 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668, *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993)). I find

that Lt. Mitchell has failed to show the School Board's proffered reason was pretextual.

Lt. Mitchell first argues that the School Board had the final say regarding who would be interviewed (ECF No. 47 at 13–14), but this does not rebut the School Board's claims that it retained the FPCA because of its expertise in this area and that the School Board followed the FPCA's advice as to the top three candidates to interview. ECF No. 53 at 6.

Lt. Mitchell also attempts to establish pretext by showing the School Board has demonstrated a lack of credibility. ECF No. 47 at 15–16. In *Arlington v. Cobb Cty.*, 139 F.3d 865 (11th Cir. 1998), the Eleventh Circuit explained that "a Title VII plaintiff may defeat a motion for summary judgment by undermining the credibility of a defendant's explanation for its actions":

> [P]roof that a defendant's articulated reasons are false is not *proof* of intentional discrimination; it is merely *evidence* of intentional discrimination. However, *evidence* of intentional discrimination is all a plaintiff needs to defeat a motion for summary judgment. That evidence must be sufficient to create a genuine factual issue with respect to the truthfulness of the defendant's proffered explanation.

*Arlington*, 139 F.3d at 875 (brackets in original) (quoting *Howard v. BP Oil Co.*, 32 F.3d 520, 525 (11th Cir. 1994)).

Here, Lt. Mitchell's claims about Mark Mitchell's credibility do not create a genuine factual issue regarding the truthfulness of the School Board's proffered nondiscriminatory reason for declining to interview Lt. Mitchell. Likewise, Lt. Mitchell's assertion that Ms. Paul misled him by saying that Lt. Mitchell was not interviewed because the School Board relied on the FPCA's recommendations does

not establish that Ms. Paul was dishonest; rather, it establishes that the School Board has proffered the same reason for its choice of interviewees even prior to the initiation of litigation.

Viewing the facts in the light most favorable to Lt. Mitchell, he has not carried his burden of establishing that the School Board's nondiscriminatory reason was pretextual under the *McDonnell-Douglas* standard, nor has Lt. Mitchell presented a "convincing mosaic of circumstantial evidence" creating a triable issue of fact as to whether the School Board's hiring of its police chief was discriminatory. *Lewis II*, 934 F.3d at 1185. Notably, there is a lack of evidence to create a factual dispute about the School Board's motivation in using an outside contractor to select its interviewees. Although "an employer cannot delegate…aspects of its…procedure to another agency…and then escape liability if that agency develops discriminatory practices," Lt. Mitchell has not alleged that the FPCA's practices in developing its recommendations were discriminatory. *Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1294 (11th Cir. 1988). Lt. Mitchell has not proven (or even proposed) that the School Board's deference to the FPCA's recommendations amounts to a reliance on the discriminatory practices of a third party. Given Lt. Mitchell's failure to show that the School Board's asserted nondiscriminatory reason is pretextual, I find that Lt. Mitchell may not rely on his assertion that the School Board discriminated against

him by not interviewing him for the Chief position as an independent basis for his discrimination claims in Counts I, II, and III.[11]

### 2. Denial of Promotion to Major

The School Board does not challenge Lt. Mitchell's ability to make the requisite prima facie showing of disparate treatment as to the School Board's failure to promote Lt. Mitchell to Major. ECF No. 43 at 15. In an effort to rebut the presumption created by Lt. Mitchell's prima facie showing, the School Board proffers the following nondiscriminatory reason for declining to promote Lt. Mitchell: that he "scored sixth out of seven [in the interview process], and the four candidates chosen were the four highest scorers." ECF No. 43 at 16. The School Board's proffered reason satisfies its burden of production.

In response, Lt. Mitchell again questions the credibility of the School Board's witnesses and argues that the School Board's "own EEO Department cannot recall in its 17 years of investigating complaints any findings of valid race discrimination complaints." ECF No. 47 at 19. This assertion mischaracterizes the deposition

---

[11] Lt. Mitchell briefly argues that "in June of 2018, there were issues with the lack of opportunities for minorities at the School District, and minority employees were not getting hired into positions at the District." ECF No. 47 at 16. While the School Board's racial diversity (or lack thereof) might be used as part of a "convincing mosaic" of other circumstantial evidence tending to show a discriminatory intent, standing alone, Lt. Mitchell's generalized allegation is insufficient to show that the School Board's proffered nondiscriminatory explanation is false. Moreover, Lt. Mitchell has not presented the type of statistical comparison necessary to show the School Board's reason was pretextual. *See Roberson v. Snow*, 404 F. Supp. 2d 79, 91 (D.D.C. 2005) ("Although statistics can in some cases support a finding of pretext . . . plaintiff has provided no sufficiently meaningful or detailed historical statistics.") (citing *Cook v. Boorstin*, 763 F.2d 1462, 1468 (D.C. Cir. 1985)).

testimony of EEO Coordinator Ms. Wellings, who was asked by Lt. Mitchell's counsel whether it was possible that in the 17 years Ms. Wellings had been working for the School Board, she never found a valid complaint of racial discrimination. Ms. Wellings responded, "[I]s it possible? You know, maybe, but I don't believe it is." ECF No. 44-6 at 41:15-17.  Ms. Wellings further clarified her response, stating, "I know that I have" found valid complaints of racial discrimination, but that she had not "looked at that information to prepare" for her deposition. ECF No. 44-6 at 33:4–20, 39:12–41:17. Moreover, during this exchange, defense counsel noted that the subject was "outside the scope of the topics noticed for today." ECF No. 44-6 at 33. Read in context, this testimony is insufficient to demonstrate that the School Board's non-discriminatory reason was pretextual.

Lt. Mitchell's other arguments regarding the credibility (or alleged lack thereof) of Mark Mitchell and Ms. Paul fail for the same reasons outlined above. Therefore, Lt. Mitchell has failed to show the School Board's nondiscriminatory explanation for declining to promote him to Major was pretextual, and Lt. Mitchell cannot rely on this action as an independent basis for any of his discrimination claims.[12]

### 3.  Denial of Promotion to Assistant Director

The School Board seeks summary judgment on Lt. Mitchell's claims relating to the Assistant Director position because Lt. Mitchell failed to raise this specific act

---

[12] Lt. Mitchell does not argue that his claim as to the Major position can survive summary judgment based on circumstantial evidence outside of the *McDonnell Douglas* framework, so I need not consider this alternative method.

of alleged discrimination before the EEOC and thus, he has failed to exhaust his administrative remedies to those claims. ECF No. 43 at 5.

Courts have long held that plaintiffs must first exhaust their available remedies by filing a charge of unlawful discrimination with the appropriate administrative agency before filing a lawsuit. *Smith v. Potter*, 310 F. App'x 307, 310 (11th Cir. 2009). Once a plaintiff has exhausted his administrative remedies, he may proceed to the courts but his "judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004) (citation omitted). While a plaintiff may raise judicial claims of discrimination if they "amplify, clarify, or more clearly focus" the allegations in the plaintiff's EEOC complaint, "allegations of new acts of discrimination are inappropriate" in a federal lawsuit if they have not first been raised before the EEOC. *Id.* (citation omitted). Courts have held that an allegation of "failure to promote" is a "discrete act" of discrimination that triggers the exhaustion requirement. *Smith*, 310 F. App'x at 310.

Here, Lt. Mitchell appears to concede that because his EEOC charges did not include his claim that the School Board discriminated against him by failing to promote him to the Assistant Director position, he is precluded from raising it as a separate claim for damages in this lawsuit. In his response, Lt. Mitchell states:

> While [it is] true that [Lt. Mitchell] *may* not be able to bring a claim for discrimination or retaliation under Title VII or the FCRA based on [the School Board's] failure to promote [Lt. Mitchell] to Assistant Director, the lack of the specific allegation of [the School Board's] failure to

promote [Lt. Mitchell] to Assistant Director in either of his charges certainly does not negate [the School Board's] racial discrimination and retaliation based on [the School Board's] failure to interview [Lt. Mitchell] for the Chief of Police position, failure to promote him to Police Major, and/or transferring him from the high school to the middle school under Title VII, the FCRA, or § 1981.

ECF No. 47 at 11–12. To the extent the School Board wishes to prevent Lt. Mitchell from raising at trial the School Board's failure to promote him to Assistant Director, not as a separate claim, but as "evidence of a pattern and practice of racial discrimination and retaliation in [the School Board's] culture" (*Id.* at 12), this issue is not one to be decided on summary judgment.

Under § 1981, Lt. Mitchell may pursue a claim with the Assistant Director position as its independent basis since "[u]nlike Title VII, § 1981 does not require that a plaintiff exhaust administrative remedies before filing an action in federal court." *Green v. Elixir Indus., Inc.*, 152 Fed. App'x 838, 841 (11th Cir. 2005) (citing *Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971)). The School Board concedes for purposes of this motion that Lt. Mitchell has established a prima facie case of discriminatory intent as to his § 1981 claim of discrimination based on the School Board's failure to promote him to Assistant Director. ECF No. 43 at 13. The School Board asserts that it has a legitimate, nondiscriminatory reason for declining to promote Lt. Mitchell to Assistant Director and that Lt. Mitchell cannot show this reason to be pretextual. *Id.*

As a nondiscriminatory reason for the decision, the School Board states that "Chief Kitzerow selected Ms. Price and Mr. Weiner because they were both experienced Police Chiefs," which was relevant to the role played by Assistant

Directors. *Id.* I find that the School Board's assertion that it hired other candidates because their work experience was superior to Lt. Mitchell's meets the School Board's burden of production. *See, e.g.*, *Keaton v. Cobb Cty., Georgia*, No. 08-11220, 2009 WL 212097, at *6 (11th Cir. Jan. 30, 2009) (finding employer had met its burden of producing a nondiscriminatory reason by asserting "greater experience" where the plaintiff and the candidate ultimately hired both had the preferred four-year degrees, but the candidate hired had more experience).

In response, Lt. Mitchell appears to argue that experience as a Police Chief is unnecessary to succeed in the Assistant Director position. ECF No. 47 at 17. I reject this argument; an employer may reasonably hire candidates with even more experience than that which is required. *See Keaton*, 2009 WL 212097, at *6 (quoting *Chapman v. AI Transport.*, 229 F.3d 1012, 1037 n.30 (11th Cir. 2000) (*en banc*) (internal quotation marks omitted) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."). Moreover, Lt. Mitchell's argument does not show that discrimination was the but-for cause of the hiring decision as required by § 1981. *Comcast*, 140 S. Ct. at 1014.

Lt. Mitchell next argues that the School Board's insistence that it aimed to increase racial diversity in its Police Department's chain of command while failing to meet that goal, plus Ms. Wellings's statements about her difficulty remembering valid complaints of race discrimination, "demonstrate[ ]a genuine issue of material

fact as to the truth or falsity of [the School Board's] alleged legitimate, non-discriminatory reason for not promoting" Lt. Mitchell. ECF No. 47 at 17–18. As noted above, I find the argument regarding Ms. Wellings's testimony unpersuasive. With regard to the School Board's goal of increasing racial diversity in the hierarchy of its Police Department, the undisputed facts show that Chief Kitzerow has made efforts to achieve that goal. In any event, neither of these claims constitute circumstantial evidence sufficient for a reasonable jury to find discrimination to be the but-for cause of the School Board's decision to hire Assistant Directors Price and Weiner, both former Police Chiefs, one of whom is African-American, instead of Lt. Mitchell, who had never served as a Police Chief. Based on Lt. Mitchell's failure to exhaust his administrative remedies and to show the School Board's proffered nondiscriminatory reason for hiring other candidates was pretextual, I find that Lt. Mitchell may not rely on the School Board's decision not to promote him to Assistant Director as an independent basis for the claims in Counts I, II, or III.

### 4. **Transfer from BBHS to LWMS**

According to the School Board, Lt. Mitchell's discrimination claim based on his relocation fails because he cannot make out a prima facie case of disparate treatment. ECF No. 43 at 14. Specifically, the School Board contends that (1) Lt. Mitchell cannot show that his relocation constituted an adverse employment action and (2) Lt. Mitchell has not identified comparators who are similarly situated. *Id.*

I find that Lt. Mitchell has abandoned his claim that his relocation to a new school constituted discrimination. Lt. Mitchell's response papers only address his

relocation in the context of his retaliation claims. *See, e.g.*, *Cusick v. Yellowbook, Inc.*, 607 Fed. App'x 953, 954 n.1 (11th Cir. 2015) (citing *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318–19 (11th Cir. 2012)) ("[The plaintiff] also raised claims for association discrimination under the ADA based upon his termination and for retaliation. However, he did not address these claims in his response to [the defendant's] motion for summary judgment, and the district court properly deemed them abandoned."). Assuming *arguendo* that Lt. Mitchell did not abandon this claim, I find that Lt. Mitchell has failed to make out a prima facie case that his relocation constituted discrimination because he has failed to meet his burden of showing that it was an adverse action.

The adverse action standard for discrimination claims generally requires a tangible effect on the employee. As the Eleventh Circuit has explained:

> For disparate treatment, an adverse employment action must "impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by* [*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)]. Proof of "direct economic consequences" is not required, but a plaintiff must show "a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original).

*Minnifield v. City of Birmingham Dep't of Police*, 791 Fed. App'x 86, 90 (11th Cir. 2019). *See also Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) (quoting *Doe v. Dekalb Cty. School Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998)) ("We use an objective test, asking whether 'a reasonable person in [the plaintiff's] position would view the employment action in question as adverse.'"). The Eleventh Circuit has also noted that "'[t]he clear trend of authority is to hold that' a

purely lateral transfer is not an adverse employment action" in several legal contexts related to discrimination and disparate treatment. *Dekalb Cty.*, 145 F.3d at 1450 (quoting *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997)).

Here, viewing the evidence in the light most favorable to Lt. Mitchell, it is insufficient to show that Lt. Mitchell's relocation amounted to an adverse employment action.  Lt. Mitchell's claims in his Second EEOC Charge that BBHS was a more convenient location for him and that he preferred sharing job responsibilities with a co-worker do not satisfy his burden of showing that his relocation constituted a serious and material change in his employment conditions. Rather, Lt. Mitchell's relocation was simply a lateral transfer which, standing alone, is insufficient to establish an adverse employment action.[13] *See, e.g.*, *Martin v. Eli Lilly & Co.*, 702 Fed. App'x 952, 958 (11th Cir. 2017) (citing *Dekalb Cty.*, 145 F.3d at 1450) (noting that "a purely lateral transfer…would not be adverse"); *cf. Hinson*, 231 F.3d at 829 (citing *Dekalb Cty.*, 145 F.3d at 1448) ("In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility."). Therefore, Lt. Mitchell is not entitled to rely on his relocation as a discrete employment action to prove his claims of discrimination in Counts I, II, and III.

---

[13]  Since I have found that Lt. Mitchell abandoned his claim that his transfer to LWMS was discriminatory and that in any event, his transfer did not constitute an adverse action, I need not address whether any purported comparator was similarly situated.

Lt. Mitchell has not met his burden of showing that a reasonable jury could find in his favor on any of the discrimination claims alleged in Counts I, III, and III. The School Board's Motion for Summary Judgment on those counts should be granted.

B. *Retaliation Claims (Counts IV, V, and VI)*

1. **Protected Activities**

Lt. Mitchell argues that "[e]ach of [the following] actions constitutes a separate protected action": Lt. Mitchell's public records request; Lt. Mitchell's filing of an EEOC charge; Lt. Mitchell's retention of counsel; and Lt. Mitchell's counsel's additional public records requests. ECF No. 47 at 3. Lt. Mitchell also states that he "opposed the unlawful employment practice of racial discrimination when he voiced his concerns at a board meeting," presumably arguing that this activity also fits within the definition of a protected activity. *Id.* at 3–4.

There is no question that Lt. Mitchell engaged in protected activity when he filed his two EEOC Charges. *See, e.g.*, *Satchel v. Sch. Bd. of Hillsborough Cty.*, 251 Fed. App'x 626, 628 (11th Cir. 2007) ("[A]n EEOC complaint constitutes protected activity."). The parties do, however, dispute whether the other actions Lt. Mitchell named qualify as protected activities.

In a Title VII retaliatory termination claim, the Eleventh Circuit stated:

[The plaintiff's] general complaint about [her supervisor's] poor treatment of her is insufficient to establish that she engaged in protected activity. *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) (noting that, while a formal complaint is not necessary to establish that a plaintiff engaged in a protected activity, she must have explicitly or implicitly communicated her belief that the employer's

> practice constituted unlawful employment discrimination); *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (noting that a complaint that alleges unfair treatment but does not relate the treatment to a protected classification does not constitute statutorily protected activity).

*Rodriguez v. Miami Dade Cty. Pub. Housing and Cmty. Dev.*, 776 Fed. App'x 625, 626 (11th Cir. 2019).

Lt. Mitchell does not allege, nor does the evidence show, that his statements at the board meeting, his public records requests, his retention of counsel (or counsel's notification to the School Board that she had been retained), or his counsel's public records requests referenced race discrimination. *See* PSOF ¶ 133 ("On June 20, 2018, Lt. Mitchell requested records from [the School Board] after being denied an interview. He also attended a board meeting that day to discuss his dissatisfaction with the interview process for the Chief of Police position. He told [the School Board] he was not finished with them.") (internal citations omitted); *see also* ECF No. 49-11 (showing counsel for Lt. Mitchell requesting records without mentioning discrimination), ECF No. 49-10 (showing Lt. Mitchell requesting records without mentioning discrimination). Although the parties dispute whether any employee of the School Board knew Lt. Mitchell's attorney specialized in civil rights law (PSOF ¶ 134), even assuming a relevant decision-maker at the School Board had knowledge, that fact would not convert the contact between counsel for Lt. Mitchell and the School Board into a protected activity. *See Smith v. City of Fort Pierce, Florida*, 565 F. App'x 774, 777 (11th Cir. 2014) (attorney's email notifying the city that the plaintiff had retained her for legal representation did not constitute protected activity because

the email "did not oppose any unlawful employment practice and was not sent in conjunction with or after the filing of any discrimination claims").

Citing to his affidavit, Lt. Mitchell claims that at a School Board meeting, he stated that he "was not finished with [the School Board] and their discrimination" (PSOF ¶ 85), but even Lt. Mitchell's own affidavit does not support the allegation that Lt. Mitchell mentioned discrimination at the meeting. ECF No. 49-6 at ¶ 13. Since Lt. Mitchell "failed to allege that the complaints included in [the conduct cited] had any relationship to race or otherwise indicate that the School Board was engaged in unlawful employment practices," none of those actions can be considered protected activities. *Satchel*, 251 Fed. App'x at 628. Therefore, the only protected activity in which Lt. Mitchell engaged was the filing of his EEOC charges on December 18, 2018, and July 8, 2019.

### 2. **Adverse Employment Actions and Causation**

In his response papers, Lt. Mitchell narrows his retaliation claims to two discrete acts: his transfer to LWMS and the School Board's refusal to promote him to Major. Lt. Mitchell has abandoned the use of any other events as independent bases for retaliation claims by failing to address them in his response papers. ECF No. 47; *see Cusick*, 607 Fed. App'x at 954 n.1 (citing *Hamilton*, 680 F.3d at 1318–19) ("[The plaintiff] also raised claims for association discrimination under the ADA based upon his termination and for retaliation. However, he did not address these claims in his response to [the defendant's] motion for summary judgment, and the district court

properly deemed them abandoned."). Therefore, I will limit my consideration to these two retaliatory claims only.

> ### a.  Transfer from BBHS to LWMS

"[R]etaliation claims have a relaxed standard [for alleging adverse employment actions,] requiring only a showing of a materially adverse action that 'might [ ] dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Minnifield*, 791 Fed. App'x at 90 (quoting *Crawford*, 529 F.3d at 974).

The parties' competing statements of facts reveal a genuine dispute as to whether either of the relevant decision-makers—Sgt. Furtado and Capt. Dilbert— knew about Lt. Mitchell's preference to work at BBHS. DSOF ¶ 74; PSOF ¶ 74. A reasonable jury could find Lt. Mitchell's transfer from BBHS to LWMS might well have dissuaded him from making a charge of discrimination, thus rendering it an adverse employment action for purposes of a retaliation claim. *See Burlington N.*, 548 U.S. at 69, 126 S. Ct. 2405, 165 L. Ed. 2d 345 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters…A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").

However, because Lt. Mitchell filed his First EEOC Charge after Sgt. Furtado recommended Lt. Mitchell's relocation (DSOF ¶¶ 63, 75, 84), and I have already found that Lt. Mitchell's other conduct which predated his transfer does not rise to the level of protected activity, Lt. Mitchell cannot satisfy the causation requirement of a prima

facie case and so his claim of retaliation based on the transfer fails. *See Wallace v. Duval Cty. Pub. Sch. Sys.*, No. 3:08-CV-585-J-34TEM, 2009 WL 10670775, at *4 (M.D. Fla. Nov. 16, 2009) (court had no basis to consider alleged retaliatory activity that predated plaintiff's EEOC charge), aff'd, 387 F. App'x 899 (11th Cir. 2010).

b. <u>Failure to Promote to Major</u>

This leaves only the School Board's decision not to promote Lt. Mitchell to the position of Major as a possible basis for a retaliation claim. The Court finds a reasonable jury could determine that the School Board's failure to promote Lt. Mitchell to the position of Major meets the lenient standard for an adverse employment action in the retaliation context, i.e., that an inability to obtain a promotion "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57, 126 S. Ct. 2405, 165 L. Ed. 2d 345.

Nevertheless, once again, Lt. Mitchell cannot satisfy the causation prong. Lt. Mitchell lacks evidence showing that Chief Kitzerow knew of Lt. Mitchell's protected activities prior to making hiring decisions. Therefore, Lt. Mitchell cannot meet his burden to show that Chief Kitzerow, the relevant decision-maker, knew of Lt. Mitchell's protected activity at the time of the hiring decision.

"[D]iscrimination and retaliation under Title VII concerns 'actual knowledge, real intent, not constructive knowledge and assumed intent,' which means 'we must focus on the actual knowledge and actions of the decision-maker.'" *Zarza v. Tallahassee Hous. Auth.*, 686 Fed. App'x 747, 754 (11th Cir. 2017) (quoting *Walker*,

286 F.3d at 1274). The Eleventh Circuit has held that where there is no evidence the decision-maker as to an adverse employment action had "actual knowledge of [a plaintiff's] complaint of race-based hostility, [the plaintiff could] not satisfy the causation element of a *prima facie* case for retaliation, and his claim accordingly fail[ed]." *Zarza*, 686 Fed. App'x at 754.

Here, Lt. Mitchell fails to show actual knowledge and argues only that the knowledgeable individuals within the School Board's organization *should have* informed Chief Kitzerow of the First EEOC Charge. ECF No. 47 at 8. Given Lt. Mitchell's inability to establish a prima facie case of retaliation as to either his transfer or the School Board's refusal to promote him to Major, summary judgment in favor of the School Board is proper as to Counts IV, V, and VI.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that the School Board's Motion for Summary Judgment (ECF No. 43) be **GRANTED.**

## **NOTICE OF RIGHT TO OBJECT**

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Rodolfo A. Ruiz, United States District Court Judge for the Southern District of Florida, within FOURTEEN (14) DAYS of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the

district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

 **If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**


 **DONE AND SUBMITTED** in Chambers this 25th day of March, 2021, at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE